Ralph Weber, Jr., A Minor by His Father and Next Friend, Ralph Weber, Sr., Plaintiff-Appellant, *v.* Northern Illinois Gas Company *et al.,* Defendants-Appellees.

(No. 54796;

First District (1st Division)—March 5, 1973.

626

Nat P. Ozmon, of Horwitz, Anesi & Ozmon, of Chicago, (Dario A. Garibaldi, of counsel,) for appellant.

Kirkland & Ellis, of Chicago, (Francis B. Libbe, Leo K. Wykell, and Gary M. Elden, of counsel,) for appellees.

Mr. JUSTICE EGAN delivered the opinion of the court:

Plaintiff, Ralph Weber, Jr., filed a complaint in two counts seeking to recover for personal injuries sustained as a result of an accident which occurred while he was employed as a construction worker. Count I was founded on common law negligence and Count II on the Structural Work Act. (Ill. Rev. Stat. 1967, ch. 48, sec. 60 *et seq.*) Count II was dismissed on defendants' motion on December 18, 1968, on the ground it did not state a cause of action under the Act. The order stated:

> "* * * and it is considered by the court that, as to Count II of the amendment to the complaint, the plaintiff take nothing by his suit against these defendants, and that the defendants go hence without day and have judgment for their costs and execution thereon; and the court further finds that there is no just reason to delay enforcement or appeal of this order."

On May 2, 1969, the court entered summary judgment on behalf of the defendants on Count I. The quoted language from the dismissal order of December 18, 1968, appeared also in the order of May 2, 1969. On May 29, 1969, the plaintiff filed a motion for rehearing on both orders

alleging, in part, that the order of December 18, 1968, was not final and appealable. Pursuant to leave of court, plaintiff filed various affidavits and excerpts from depositions applicable to Count I. On November 18, 1969, the court entered an order concluding: "It is hereby ordered that said motion to vacate [the orders of December 17 (sic), 1968 and May 1 (sic), 1969] be denied; thus rendering said orders final and appealable." The confusion between December 17 and 18, and May 1 and May 2 stems from the fact that "December 17" and "May 1" appear to be the days the orders were prepared, but they were not entered until December 18 and May 2.

The notice of appeal filed December 17, 1969, prayed that the orders of December 17, 1968, May 1, 1969, and November 18, 1969, be reversed. The original brief filed August 24, 1969, by the plaintiff expressly excluded the ruling on Count II from the appeal. Later, pursuant to leave of this court, plaintiff filed a supplemental brief which urged a reversal of the order dismissing Count II. The defendant filed a motion to strike that portion of the appeal. That motion, unsupported by any authority, was denied by this court.

The plaintiff now urges a reversal of all orders dealing with both Counts because Count II does state a cause of action under the Act and summary judgment was improperly granted on Count I since questions of fact existed which could only be resolved by the jury. The defendant contends that the record did not disclose any triable issue of fact on Count I, that Count II did not state a cause of action under the Structural Work Act and that this court lacks jurisdiction to pass on the appeal insofar as it applies to Count II. The plaintiff replies that this court does have jurisdiction and that our order denying the defendant's motion to dismiss that portion of the plaintiff's appeal is *res judicata*.

■■ Initially, we must reject the argument of the plaintiff that our order denying the motion to dismiss the appeal on Count II is *res judicata*. The question of whether a court has jurisdiction is *always* open, and the court may of its own motion dismiss an action where want of jurisdiction appears. *Village of Glencoe v. Industrial Com.*, 354 Ill. 190, 188 N.E. 329.

Supreme Court Rule 303, (Ill. Rev. Stat. 1971, ch. 110A, sec. 303) provides:

> "(a) Time. Except as provided in paragraph (b) below, [Forcible Entry and Detainer and Local Improvement and Drainage Cases] the notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from, or, if a timely post-trial motion directed against

the judgment is filed, whether in a jury or a nonjury case, within 30 days after the entry of the order disposing of the motion. * * * ."

Since the motion for rehearing filed May 29, 1969, was more than thirty days after the entry of the order of December 18, 1968, the threshold issue is whether the order of December 18, 1968, was a final and appealable one.

Supreme Court Rule 304, (Ill. Rev. Stat. 1971, ch. 110A, sec. 304) provides:

"(a) * * * If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying enforcement or appeal. * * * The time for filing the notice of appeal shall run from the entry of the required finding. * * * ."

In *Cunningham v. Brown,* 22 Ill.2d 23, 174 N.E.2d 153, a three-count complaint was filed. Count I alleged a claim for damages pursuant to the grant of a statutory cause of action by the Liquor Control Act. Count II alleged another separate cause of action based on the Act and Count III alleged common law negligence. Counts II and III were dismissed on the ground that the Liquor Control Act provided the only remedy against tavern operators and owners of premises for injuries to persons by an intoxicated person. The court made an express finding that there was no just reason for delaying the appeal. A motion to dismiss the appeal was made on the ground that the complaint did not involve multiple claims but only a single claim stated in various ways. The court denied the motion to dismiss holding that, although arising from the same occurrence or transaction, the bases of recovery in Counts II or III were different from that in Count I. Similarly, in *Padulo v. Schneider,* 346 Ill.App. 454, 105 N.E.2d 115, the complaint alleged in one count a cause of action under the Dram Shop Act and common law negligence in another. The court held the dismissal of one count was appealable, because it disposed of a distinct cause of action.

In *Central Wisconsin Motor Trans. Co. v. Levin,* 66 Ill.App.2d 383, 214 N.E.2d 776, a single count complaint sought specific performance and damages for breach of contract. The court struck those portions of the complaint pertaining to specific performance and found there was no just reason for delaying the appeal. The Appellate Court held that the order was final and appealable.

■■■ We find the rationale of these cases applicable here. Under

Count I of the complaint in this case the plaintiff must prove negligence on the part of the defendants and that he was free from contributory negligence. Under Count II the plaintiff must prove that he was "in and about" a structure, that one of the devices enumerated in the statute was erected, constructed, placed or operated in an unsafe manner and that the defendant was in charge of the work. The defendant does not have available the defense of contributory negligence. The obligation of a contractor to provide a safe place to work has been expressly held to be different from the obligations under the Act. *Parizon v. Granite Steel Co.*, 71 Ill.App.2d 53, 218 N.E.2d 27; *Morck v. Nicosia*, 91 Ill.App.2d 327, 235 N.E.2d 287.

The plaintiff relies on the following cases: *Veach v. Great Atlantic and Pacific Tea Co.*, 22 Ill.App.2d 179, 159 N.E.2d 833; *Davis v. Childers*, 33 Ill.2d 297, 211 N.E.2d 364; *Martino v. Barra*, 37 Ill.2d 588, 229 N.E.2d 545; *O'Leary v. Siegel*, 120 Ill.App.2d 12, 256 N.E.2d 127.

In *Veach*, the Appellate Court refused to accept the trial court's finding of finality because both counts of the tort complaint referred to one occurrence, with no difference as to date, time, place or parties but with some differences of wording of the several charges of negligence. In *Davis*, a verdict was returned in favor of the defendant partnership in a personal injury action. The trial court sustained plaintiff's motion for judgment notwithstanding the verdict and made a finding that there was no reason for delay. The Supreme Court held that the finding did not have any effect because neither multiple parties nor multiple claims were involved. In *Martino*, the complaint for personal injuries was against several defendants, including Cities Service Oil Co., who had a cross-claim against other defendants for property damage. The trial court granted the plaintiff's motion for judgment *n.o.v.* against defendants other than Cities Service, granted a motion for a new trial on damages only, made a finding there was no reason for delaying the appeal and entered judgment for Cities Service on its cross-claim. Appeals were taken from both orders. The Supreme Court held:

> "We deem that the trial court abused its discretion in finding that there was no just reason to delay appeal of its order. * * * [T]he trial court's judgments *n.o.v.* * * * were not final and * * * were not appealable." p. 595.

In *O'Leary*, the original complaint was brought under the Structural Work Act; a second count for negligence was added after the expiration of two years. The only issue was whether the second count was barred by the Statute of Limitations. The case was decided on the interpretation of Section 46 of the Civil Practice Act, which authorizes amendments

setting up new causes of action and provides that causes of action arising from the same occurrence in the amended complaint shall not be barred by lapse of time, where the original pleading was filed in apt time.

■■ None of the cases cited by the plaintiff is apposite to the case before us. We note particularly the language of *Martino* indicating that the finding of appealability in an order is a matter of judicial discretion. That pronouncement was made expressly in *Vogel v. Melish*, 37 Ill. App.2d 471, 474, 185 N.E.2d 724:

> "Such an order should not be entered routinely. Section 50(2) [the predecessor of Rule 304] was enacted for two principal purposes, (1) to discourage piecemeal appeals and (2) to remove the uncertainty as to the right and time to appeal which theretofore existed when a final judgment was entered on less than all of the matters in controversy. [Citation.] A trial judge should keep the first of these purposes in mind when requested to make the express finding that there is no just reason for delaying appeal. As the practice has developed the certification is expected to be entered for the asking, whereas in reality *it is a matter calling for the careful exercise of the court's discretion."* (Emphasis added.)

■■■ While the order of December 18 appears to have been drafted by the attorney for Northern Illinois Gas Company, the record does not show any objection by the plaintiff. Under all the circumstances before him, the trial judge did not abuse his discretion in making the finding that there was no just reason for delaying an appeal. Having so exercised his discretion and the order being final on December 18, 1968, the trial court was powerless, subject to other relief available under the Practice Act, to change it. The finding in the order of November 18, 1969, that the orders of December 17 and May 1 were now final and appealable as of November 18 was of no force or effect, regardless of the fact that the language was included in the order at the insistence of the defendants. (*In re Estate of Schwarz*, 63 Ill.App.2d 456, 212 N.E.2d 329.) No timely appeal having been filed from the order of December 18, 1968, we are without power to proceed. The appeal as to Count II is, therefore, dismissed.

In addition to the pleadings, the record on the motion consisted, in substance, of the deposition and affidavit of the plaintiff, the depositions of Albert Krueger and Neil Santee, the affidavit of Arnold Schrader, and a copy of the contract between Northern Illinois Gas Company, hereafter called Northern, and Lyman Construction Company, hereafter called Lyman.

For the purpose of the motion, the following must be taken as true:

the plaintiff, eighteen at the time of the occurrence, had been employed as a welder's assistant on June 17, 1966, by Lyman for only three or four days. He had no previous experience in construction work. Lyman and Geneva Construction Company were both subcontractors working on an installation of a gas pipeline owned by defendant, Northern. On the site, Geneva used a side boom tractor, and Lyman, a Pitman truck with a boom, for the installation of the pipe in a trench. Arnold Schrader, a consultant in the field of engineering and construction, testified as an expert witness that the Pitman truck with a boom was improper and inadequate equipment to perform the phase of construction that was being performed for the following reasons: the Pitman must be operated during a pipe movement with a lengthy amount of cable let out to the attaching point; the Pitman must remain on a solid, hard type of surface; in order to get enough power to make the movement, the speed and motion of the truck are needed because the power from the boom is insufficient; lengthy amounts of cable from the distant power source (the Pitman) is a dangerous practice on a construction site; the operator of the Pitman has insufficient visibility and view of the area surrounding the use of the truck and the cable; a signal system between the connecting point and the operator is practically impossible to maintain and use. Movements of the pipeline must be made by "jumping" and fast movements of the truck with a lengthy amount of cable extending to the connecting point. In Schrader's opinion the recognized, proper and adequate equipment to perform the type of construction involved was the Sideloader because there is no necessity to use an extensive amount of cable, it has adequate power obviating sudden speedy movements, it can operate efficiently on any type of surface, there is no necessity under the conditions shown to have existed to use any lengthy amount of cable allowing looping of the cable and it can, under most circumstances, work in close proximity to the pipe and the point of attachment for the movement of the pipe. He further testified that in 1966 and for a long time prior thereto a Pitman was "antiquated, out of date, unsafe, and not an acceptable piece of equipment for the performance of the type of construction involved" and that for the same period "it was universally accepted in the construction industry within the Chicago area that * * * any owner's representative with authority over the type of equipment used on a construction site [would] forbid the use by any contractor and/or subcontractor to [Pitman] move or install pipe within any trench or excavation."

Brian Quarrie was operating the Pitman at the time of the occurrence. He was not an operating engineer and had operated the truck for only

three or four days. When operating the truck he had no visibility behind him and could not see the plaintiff. At the time of the occurrence, thirty to forty feet of cable had been let out from the boom.

Under the terms of the contract between Lyman and Northern, Northern's representatives had the right to stop the work until, in their opinion, proper means and methods had been adopted by Lyman to prevent danger to the lives or persons of individuals; they had the right to order unsafe or inadequate equipment removed, and Lyman agreed to remove any workmen Northern's representatives designated as unfit or unskilled.

Albert A. Krueger, the plaintiff's uncle, was Construction Inspector of Northern at the job site. His job was to see "that the job [was] done properly to [Northern's] specifications, and more or less to be an overseer and that's all." His job required him to be at the site all the time the contractor worked. He was aware of his authority to call the inadequacy of equipment to the attention of Lyman's foreman. He knew that Quarrie was a new man on the job. *He did not feel that the Pitman truck was adequate equipment for this particular job.* He had previously given instructions to the plaintiff about wearing goggles and certain boots. He had told Parvin, the welder for Lyman, that the welding work was not going according to specification, that "he was just hurrying up and somebody would get into an accident if he continued to work that way." Parvin had previously told him that the Pitman was inadequate for the job due to the trees in the parkway. Krueger stated: "When you go to work and try to move these pipes, you have to move in between the trees and the boom gets in the way and when you get to pull the pipe through the trees it doesn't have the power to do the work with [sic] a side boom tractor. It was my feeling that the Pitman boom truck was inadequate for the job that was being done. There was a better way to do the job with a bigger piece of equipment. But from what I have told you, the Pitman boom was doing the job up until that time. I hadn't disapproved of the way the job was being done. * * * A side boom tractor is more powerful equipment than a Pitman boom. You still use a cable. A side boom is on cats and the Pitman is a rubber tire truck and it is not stationary enough. A side boom tractor would be able to exert more power for pulling these pipes through the trees and across the street too." He knew that Geneva used side boom tractors.

The plaintiff testified that before his injury the Pitman had been used to move the pipe. On each occasion an extensive amount of cable was pulled from the back of the Pitman. Most movements were made by speeding up the truck, moving the truck and jerking the cable taut in order to move the pipe. On some occasions, he saw the Pitman truck lift

into the air in attempts to move pipe and at the same time snapping the lengthy amount of cable when it pulled tight. Prior to his injury there had also been difficulty in the Pitman maintaining traction in movement. There were no set signals for the movement of the truck. Since there was a substantial distance between the connecting point to the pipe and the place where the truck was located, he never knew exactly when the truck was going to start in order to make a movement of the pipe. The movement of the Pitman just prior to his injury was fast. He saw the truck start up and saw the cable "whirl" into the air. That movement was similar to others that had been occurring during the construction. At about 11:30 a.m., pursuant to instructions, he pulled lengths of cable from the truck and attached it to the length of pipe which was partly in the trench and partly suspended in the air. The truck was to pull the cable taut and eventually pull the pipe up to the other pipe that had already been positioned in the trench. After this operation he was to assist in a weld of the two pieces of pipe. After he hooked up the cable to the pipe, within a "couple of seconds" the truck started to move and he saw the cable "snaking very rapidly." At the time there were loops in the cable on the ground. The cable was about one-half inch in diameter, consisting of steel strands. His left foot got caught in one of the loops, and as the cable tightened his left leg was amputated midway between the knee and the ankle.

The defendant contends that no issue of fact exists, that the unexpected start-up of the winch truck was an intervening proximate cause which made any negligence of the defendants remote and non-actionable and that the defendant had no obligation to plaintiff to supervise details of the construction job.

■■■ The purpose of summary judgment procedure is not to try an issue of fact but rather to determine whether one exists, (*Moroni v. Gulf, Mobile and Ohio Railroad Co.*, 86 Ill.App.2d 426, 230 N.E.2d 55) and the record is to be tested under the same standard as a directed verdict: Does all the evidence, viewed in its aspect most favorable to the opponent, so overwhelmingly favor the movant, that any other verdict would not be permitted to stand? (*Lumbermens Mutual Casualty Co. v. Poths*, 104 Ill.App.2d 80, 243 N.E.2d 40.) We conclude that the evidence here does not so preponderate in favor of Northern that a verdict for the plaintiff must be set aside and that whether the defendant's failure to supervise was *a* proximate cause of the injury must be determined by a jury.

The defendant cites four cases in support of its argument that the action of Lyman's employee was the intervening proximate cause, thus rendering any negligence of the defendant "non-actionable". In *Mindrop*

*v. Gage* (1914), 189 Ill.App. 599, the Appellate Court held that no more than one person could be in charge of the work under the Structural Work Act, concluding, therefore, that the evidence showed that the plaintiff's employer, rather than the general contractor, was in charge. That proposition of law has been expressly refuted in *Gannon v. C., M., St. P. & P. Ry. Co.*, 22 Ill.2d 305, 315, 316, 175 N.E.2d 785: "While the Appellate Court decisions * * * interpreting section 9 [of the Structural Work Act] as imposing civil liability only upon an owner 'having charge of' the erection of the structure (*Mindrop v. Gage*, [citation]; * * *) certainly are not binding upon this court, nevertheless, they are of historical interest and reflect the legal climate during the years immediately following the enactment of the Scaffold Act." (See also IPI 180.02.) Furthermore, *Mindrop* held that the evidence must show, under the common law count, that the general contractor and the subcontractor were jointly in control of the device since the verdict was a joint one. *Cf Leatherman v. Schueler Bros., Inc.*, 40 Ill.App.2d 56, 64, 189 N.E.2d 10.

In *Reddick v. General Chemical Co.* (1905), 124 Ill.App. 31, the defendant had no control over the plaintiff's manner of unloading acid from a freight car. Factually, it is inapposite to the present case.

In *Terminal Railroad Association v. Larkins* (1903), 112 Ill.App. 366, 371, the court held that the appellee was contributorily negligent as a matter of law, and "[W]hether or not the car was defective or [defendant] negligent in that respect, would be a question within the province of the jury, if the right to recover depended upon the answer to that question alone." If anything, this case supports the argument of the plaintiff.

■■ In *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 45 N.E.2d 665, two workers were electrocuted when, while they were working on construction of a sewer, a boom or crane operated by one defendant came in contact with an electric transmission line belonging to another defendant. The Supreme Court upheld a verdict against the operator of the crane and reversed the verdict against the power company. The court held that under certain circumstances the uninsulated wire, a certain distance from the ground, might constitute negligence. The court then posed a series of rhetorical questions which, to paraphrase, asked whether anyone could reasonably anticipate that as a natural and probable result of the power company's negligence the crane operator would negligently swing the crane to such height and such manner as to cause it to come in contact with the wire. The court held in answering in the negative that "[m]anifestly and undoubtedly, neither the lack of insulation nor the sagging wires did anything more than furnish a condition,

and the intervening, *independent* act of the crane operator was the efficient and proximate cause of the fatal injuries to the decedents." (p. 318.) (Emphasis added.) We point out first that a fact question arises whether Lyman was independent. We point out further that the power company in *Merlo* knew nothing about the construction work involved, let alone exercised no control. Under the facts of the present case we must answer similar questions in the affirmative. It can be said by a reasonably prudent person that the negligence of Quarrie, if any, was the natural and probable consequence of the failure of Krueger to stop the work, or to order the removal of the Pitman, or to inform Weber of the danger or to require some type of signaling system that would prevent the movement of the truck until all personnel were clear, the opinion of Schrader notwithstanding. It can also be said that one could reasonably anticipate that as a natural and probable result of the failure of Northern to stop the work someone would be injured. Krueger's own testimony showed that he did in fact anticipate that possibility.

In the second ground advanced by the defendant it argues:

1. The defendant could assume that their independent contractor (Lyman) would use its equipment in a reasonable manner.
2. The defendant's inspection of the job site and suggestions concerning welding did not oblige them to supervise every detail of the job.
3. The defendant's contract did not obligate them to protect the contractor's employees from the contractor's negligence.

The defendant cites *Kepperly v. Ramsden* (1876), 83 Ill. 354; *City of Moline v. McKinnie* (1888), 30 Ill.App. 419; *Karr Supply Co. v. Kroenig* (1897), 167 Ill. 560, 47 N.E. 1051; *Geist v. Rothschild & Co.* (1900), 90 Ill.App. 324; *F. J. McCain Co. v. Kingsley* (1906), 126 Ill.App. 165; *Wells Bros. Co. v. Manion* (1908), 140 Ill.App. 527; *Keenan v. Wells Bros Co.* (1908), 142 Ill.App. 1.

■■■ *Kepperly, City of Moline* and *Geist* all held that the owner was relieved of liability where the independent contractor held *exclusive* control of the work. We are in complete agreement with the principle enunciated in these cases. If we could conclude, as a matter of law, that Lyman had retained exclusive control over the work, the defendant's position would be tenable. We conclude, however, that whether he did have exclusive control was, at least, a question of fact for the jury.

■■ The other four cases, *Keenan, Wells Bros., McCain* and *Karr*, deal with the obligation of the master to provide a safe place to work for his servant. All of them preceded the enactment of the Workmen's Compensation Act in 1911. These four cases have no application, because the defendant does not contend that the relationship of master and servant

exists between it and Lyman or his employees. As the comments to Sec. 414 of the Restatement of Torts point out, liability may attach to one who retains less than that degree of control necessary to establish the relationship of master and servant.

The Restatement of Torts, Second Edition, Section 414 provides as follows:

> "§ 414. Negligence in Exercising Control Retained by Employer
>
> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.
>
> Comment:
>
> a. If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.
>
> b. The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so.

c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

■■■■ This rule and comment have been recognized as an expression of the law of Illinois. (*Larson v. Commonwealth Edison Co.,* 33 Ill.2d 316, 325, 211 N.E.2d 247.) Contrary to the argument of the defendants, the rule is applicable to *anyone* with authority who entrusts work to an independent contractor, *e.g.,* an owner, general contractor or architect. In any event, we reject the argument of the defendant that Northern was the owner and not a contractor. We hold that it was both.

■■■ We conclude that a factfinder could determine that Northern met the standards of control expressed in the comments. It did retain the power to forbid the work being done in a manner dangerous to others. It did fail to prevent the subcontractor from doing the details of the work in a dangerous manner when it knew it was so being done. It had more power than to make only suggestions or recommendations, and it did retain such a right of supervision that the subcontractor was not entirely free to do the work in his own way. *Cf Nowicki v. Union Starch and Refining Co.,* Supreme Court, No. 44828, May Term, 1972.

The defendants argue that because they did not participate in the operation of the winch truck or other pipe-moving operations they are not responsible as a matter of law. They correctly distinguish those cases cited by the plaintiff in which the defendant provided defective equipment or performed some affirmative act that led to the injury. The defendant, however, begs the question of what is meant by the word "participate". In some cases liability has been upheld against a general contractor for the failure to warn, (*Delgado v. W. C. Garcia & Associates,* 212 Cal.App.2d 5, 27 Cal.Rppr. 613; *Pichler v. Pacific Mechanical Contractors,* 1 Wn.App. 447, 462 P.2d 960), or the failure to guard against injuries, (*Leatherman v. Schueler Bros., Inc.,* 40 Ill.App.2d 56, 189 N.E.2d 10) or the failure to inspect, (*Rodgers v. Meyers and Smith, Inc.,* 57 Ill.App.2d 200, 206 N.E.2d 845.) Thus, we must reject the narrow interpretation of "participate" given by the defendants.

The plaintiff relies heavily on *Miller v. DeWitt*, 37 Ill.2d 273, 226 N.E.2d 630. In that case the verdict against an architect for common law negligence was upheld. The architect prepared the contracts and caused bids to be received which resulted in the letting of three contracts, one for the general contractor, one for plumbing and heating and one for electrical work. Three employees of the general contractor were injured. The contract between the architect and the owner provided that the architect's services would consist in part of the "general administration of the construction contract and supervision of the work". The contract between the owner and general contractor provided that the architects had authority to stop the work whenever such stoppage might be necessary to insure the proper execution of the contract. Improper shoring was used which caused the injury to the plaintiffs. The court held that, since the architect had a right to stop the work and to insist upon a safe and adequate method of shoring, the jury could find from the evidence that the architects were guilty of negligence in failing to inspect and watch over the shoring operations.

The contract before us gives an even greater right of control to the general contractor-owner than was present in the *Miller* case, and we deem the distinction raised by the defendants that *Miller* involved an architect, rather than a general contractor, specious, at best.

In support of the defendants' argument that the contract in this case did not obligate them to protect Lyman's employees, they cite *Pioneer Fireproof Construction Co. v. Hansen* (1898), 176 Ill. 100, 52 N.E. 17 and *Haugh v. Ryerson & Son* (1912), 171 Ill.App. 414.

In *Pioneer Fireproof Construction Co.*, the issue was whether under the contract the general contractor retained such a degree of control over the subcontractor that the subcontractor and his employees became the servants of the general contractor. See Comment, Restatement of Torts, Second Edition, Section 414.

In *Haugh*, no written contract was involved. The owner of the property hired an independent contractor and retained no control over the operation.

■■■■ Finally, the defendants allude to Section 9 of the contract: "9. Safety Of The Work. * * * This clause shall not be construed as implying any responsibility [of defendants] with regard to securing the safety of the work." That sentence, the defendant urges, makes explicit the rule of law that the courts applied even without an express provision. We conclude otherwise. It has been consistently held that a contractor owes an independent contractor whom he employs and all the subcontractors' employees a *non-delegable duty* to provide a safe place to work. (*Leatherman v. Schueler Bros., Inc.*, 40 Ill.App.2d 56, 61, 189 N.E.2d 10;

*Greenleaf v. Puget Sound Bridge Co.,* 58 W.2d 647, 364 P.2d 796.) If the law provides that one may not delegate a duty imposed, *a fortiori,* he may not simply divest himself of it. While Northern assumes control with one hand, it seeks to throw away responsibility with the other. Understandably, Northern wants the best of both possible worlds in construction work. Stated simply, it cannot have them.

For these reasons we conclude that it was for a jury to determine whether Northern retained such control over the work that it was required to supervise and that its failure to supervise in any of the ways ascribed in the complaint was a proximate cause of the injury to the plaintiff. The judgment of the circuit court granting summary judgment on behalf of the defendant, Northern Illinois Gas Company, is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

We further hold the record shows no evidence of liability on the part of the defendant, City of Evanston. The judgment of the circuit court granting summary judgment on behalf of the defendant, City of Evanston, is affirmed.

Judgment affirmed in part, reversed in part and remanded with directions.

BURKE, P. J., and GOLDBERG, J., concur.